UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE | ) |
| | ) Bankruptcy Case |
| LLOYD E. WEDBLAD, JR. and | ) No. 10-65055-fra7 |
| MELISSA A. WEDBLAD, | ) |
| | ) MEMORANDUM OPINION |
| Debtors. | ) |

Debtors Lloyd and Melissa Wedblad filed their Chapter 7 case on August 19, 2010. The instant matter comes before the Court on the United States Trustee's (UST) motion to dismiss under 11 USC § 707(b).[1] The Court conducted an evidentiary hearing on October 20, 2010, and thereafter took the motion under advisement. The dispositive issue in this matter revolves around the expense component of the so-called "means test" used in § 707(b)(2).

A. <u>Statutory Framework</u>:

Under § 707(b)(1), the court may dismiss a Chapter 7 case on the motion of the UST, among other parties, if the debtors have primarily consumer debts and the court finds that granting relief would be an "abuse" of the provisions of Chapter 7. Section 707(b)(2), enacted under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (2005), dictates application of a formula, commonly known as the "means test" to determine if a rebuttable presumption of

---

[1]Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

MEMORANDUM OPINION-1

abuse has arisen. In applying the means test, first, the debtor's current monthly income (CMI) is calculated. CMI, generally speaking, is a debtor's averaged gross monthly income in the 6 full months prior to filing. See, § 101(10A). If CMI times 12 is above the median family income in the state where the debtor resides, §§ 101(39A) and 707(b)(7)(A), then certain standardized and actual expenses are deducted therefrom. § 707(b)(2)(A)(ii). If the difference multiplied by 60 is at least $11,725 (or at least $7,025 and at least 25% of the debtors' total nonpriority unsecured debt), the presumption arises. § 707(b)(2)(A)(i). A debtor may only rebut the presumption by a showing of "special circumstances" which justify additional expenses or adjustment to CMI "for which there is no reasonable alternative." § 707(b)(2)(B). Here, Debtors concede the presumption arose. They further concede they failed to rebut it. Nevertheless, they challenge the presumption's validity as a matter of law.[2]

The applicable statute provides in pertinent part:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service [IRS] for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.

§ 707(b)(2)(A)(ii)(I) (emphasis added). As the emphasized language indicates, the statute dictates that the IRS's National and Local Standards (the Standards) be used in computing the means test. Debtors challenge the use of the Standards.

// // // // //

// // // // //

// // // // //

---

[2] Under § 707(b)(3), "bad faith" and "totality of the financial circumstances" are additional grounds for finding abuse. At the hearing, the parties litigated these grounds. However, § 707(b)(3) only comes into play if the presumption of abuse does not arise or has been rebutted. See, Egebjerg v. United States Trustee (In re Egebjerg), 574 F.3d 1045, 1048 (9th Cir. 2009) (§ 707(b)'s structure requires consideration of presumptive abuse question first, "and resorts to the totality of the circumstances analysis [under § 707(b)(3)] only if the debtor survives the means test . . . ."). Because here, as discussed below, issues surrounding the presumption are dispositve, the Court declines to address the § 707(b)(3) grounds.

MEMORANDUM OPINION-2

B. <u>The Standards</u>:

The Standards are:

> tables that the IRS prepares listing standardized expense amounts for basic necessities. The IRS uses the Standards to help calculate taxpayers' ability to pay overdue taxes. See 26 U.S.C. § 7122(d)(2). The IRS also prepares supplemental guidelines known as the Collection Financial Standards, which describe how to use the tables and what the amounts listed in them mean.

<u>Ransom v. FIA Card Services, N.A.</u>, __ U.S. __, 131 S. Ct. 716, 722 (2011).

> The National Standards designate allowances for six categories of expenses: (1) food; (2) housekeeping supplies; (3) apparel and services; (4) personal care products and services; (5) out-of-pocket health care costs; and (6) miscellaneous expenses. The Local Standards authorize deductions for two kinds of expenses: (1) housing and utilities; and (2) transportation.

<u>Id</u>. at 722, n.2 (internal citations omitted).

At least originally, the Standards had everything to do with tax law and nothing to do with bankruptcy law. They were first developed and issued informally in 1997 "to encourage uniformity in evaluating offers in compromise and installment agreement proposals." Matthew Stephenson & Kristin Hickman, *The Administrative Law of Borrowed Regulations: Legal Questions Regarding the Bankruptcy Law's Incorporation of IRS Standards*, 1 Norton Bankr. L. Adviser 1, 5 (2008). In 1998, Congress enacted legislation requiring their publication and use.[3] Under 26 USC § 7122(d)(1), the Secretary of the Treasury was directed to "prescribe guidelines for officers and employees of the Internal Revenue Service to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute." Under 26 USC § 7122(d)(2)(A) (the enabling statute), the Secretary was required to "develop and publish schedules of national and local allowances [the Standards] designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses." The guidelines were then to direct that "officers and employees of the Internal Revenue Service" use the Standards on a case-by-case basis, and were not to use them "to the extent such use would result in the taxpayer not having adequate means to provide for basic living expenses." 26 USC § 7122(d)(2)(B). Since being developed and published,

---

[3] Pub. L. 105-206, § 3462(c)(1), 112 Stat.766, 764 (1998).

MEMORANDUM OPINION-3

including since BAPCPA's enactment in 2005, the IRS has modified the Standards multiple times. <u>See</u>, Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers, http://www.justice.gov/ust/eo/bapcpa/meanstesting.htm.[4]

C. <u>Is § 707(b)(2)(A)(ii)(I) constitutional?</u>:

Debtors argue § 707(b)(2)(A)(ii)(I) delegates legislative power to the IRS in violation of Article 1; § 1 of the U.S. Constitution, which vests all legislative powers in the Congress.[5] It appears the constitutionality of § 707(b)(2)(A)(ii)(I) is a matter of first impression. The non-delegation doctrine has been summarized as follows:

> Article I, §1, of the Constitution vests "all legislative powers herein granted ... in a Congress of the United States." U.S. Const. art. I, § 1. Accordingly, Congress "is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is vested." *Panama Refining Co. v. Ryan,* 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *see also Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *Mistretta v. United States,* 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of government.").

<u>New York v. Salazar</u>, 2009 WL 3165591 *4 (N.D.N.Y.,2009). The threshold question in a "delegation" challenge is whether "the statute has delegated legislative power to the agency." <u>Whitman v. Am. Trucking</u>

---

[4] All cited internet materials herein are as visited Jan. 13, 2012.

[5] Although not raised by either party, Debtors may not have standing to raise the constitutional argument. They do not dispute Congress could have constitutionally incorporated the Standards that were in effect on BAPCPA's effective date of October 17, 2005, as a static set of numbers. What they challenge is later modifications by an agency as opposed to Congress. To have standing to raise a constitutional defect a party must show it has been injured thereby. <u>See</u>, <u>Maya v. Centex Corp.</u>, 658 F.3d 1060, 1067 (9th Cir. 2011). Although certain standard amounts were more generous in 2005, the Standards are a package, and when viewed as such, those in effect when Debtors filed their bankruptcy petition were more generous than those in effect in October, 2005. <u>Compare</u>, Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers (Cases Filed Between October 17, 2005 and February 12, 2006, Inclusive) (http://www.usdoj.gov/ust/eo/bapcpa/20051017/meanstesting.htm), <u>with</u>, Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers (Cases Filed Between March 15, 2010, and October 31, 2010, Inclusive) (http://www.justice.gov/ust/eo/bapcpa/20100315/meanstesting.htm). Debtors' standing is thus questionable. However, the Court need not resolve this issue, because, as discussed below, it finds the statute constitutional in any event.

MEMORANDUM OPINION-4

Ass'ns., 531 U.S. 457, 472, 121 S. Ct. 903, 912 (2001). The Court agrees with the UST that § 707(b)(2)(A)(ii)(I) does not.

In construing the statute, the Court must first look to its language. Ransom, 131 S. Ct. at 723-24. "[W]hen the . . . language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004) (internal quotation omitted). By its terms, § 707(b)(2)(A)(ii)(I) does not delegate, direct or authorize the IRS to do anything. Rather, it merely incorporates the Standards.[6] "Incorporation" must be distinguished from "delegation." The former borrows from an extra-statutory source and makes that source part of the statute's text as if set out therein. The latter directs an agency to do something in furtherance of the statute's policy.

Debtors, however, argue that incorporation is an implied delegation to the IRS to establish expense amounts to be applied in the means test. Even assuming *arguendo* this is a plausible interpretation, under the doctrine of constitutional avoidance, it should be rejected. The avoidance doctrine is a tool for choosing between competing plausible interpretations of a statutory text. Clark v. Martinez, 543 U.S. 371, 381, 125 S. Ct. 716, 724 (2005). The doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S. Ct. 1392, 1397 (1988). Debtors point to, and the Court could find, no case-law, legislative history or other authority demonstrating it was plainly Congress' intent in passing § 707(b)(2)(A)(ii)(I) to delegate means test authority to the IRS. The statute is thus constitutional.

// // // // //

---

[6] Section 707(b)(2)(A)(ii)(I) does not, however, incorporate or import the guidelines (i.e. the Collection Financial Standards). Ransom, 131 S. Ct. at 726. Rather, the guidelines are an interpretive tool which can be consulted as a persuasive but not controlling source in a court's interpretation of the Standards. Id. at 726, n. 7.

MEMORANDUM OPINION-5

D. <u>Are the Standards in "effect"?</u>:

With the passage of § 707(b)(2)(A)(ii)(I), Congress turned the Standards into bankruptcy statutes. However, it did not incorporate just any set of tax tables/allowances but rather only those "in effect" on the date of the order for relief, which in a voluntary case, is the date the debtor files his or her petition. §§ 301 and 302. If possible, the Court must give effect to every word of a statute, so as not to render any verbiage surplusage. <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001). It must therefore determine what "in effect" means. Because the Code does not define the term, the Court looks to its ordinary meaning. <u>Ransom</u>, 131 S. Ct. at 724. The ordinary meaning of "effect" in this context is: "the quality or state of being operative." Webster's Third New Int'l Dictionary 724 (unabridged. 1993). In turn, "operative" in context means: "having the power of acting: exerting force or influence." Webster's Third New Int'l Dictionary 1581 (unabridged ed. 1993). At minimum, to be able "to exert force or influence" the Standards must have been developed in accordance with law. <u>See</u>, <u>The Pantry, Inc. v. Stop-N-Go Foods, Inc.</u>, 777 F. Supp. 713, 731 (S.D. Ind. 1991), <u>mod. on den. of reconsid.</u>, 796 F. Supp. 1164 (S.D. Ind. 1992) (for purposes of a warranty in a sales agreement incorporating state environmental rules "in effect" at time of the agreement's execution, state requirements that had not been properly promulgated under Indiana's version of Administrative Procedure Act were not valid, had no legal effect, and thus were not "in effect."). Therefore, the Court will address Debtors' three arguments as to why the Standards at the time they filed their case were not developed in accordance with law and thus of no "effect." In doing so, the Court rejects the UST's argument that because no agency or court has heretofore held the Standards invalid or unenforceable, they are "in effect." If that were the case, no court could ever review the validity of agency actions.

1) <u>Constitutionality of 26 USC § 7122(d)(2)(A)</u>:

Debtors argue first that the enabling statute unconstitutionally delegates legislative power to the Secretary of the Treasury. As a threshold matter, the UST argues Debtors have no standing to raise this argument because this is not a tax case. The Court disagrees. If the enabling statute is unconstitutional, the Standards could not be "in effect." Turning to the merits, the <u>Salazar</u> court summarized the applicable constitutional standard for delegating authority to an agency:

MEMORANDUM OPINION-6

> [T]he Supreme Court has recognized that "Congress simply cannot do its job absent an ability to delegate power under broad general directives" and therefore Congress may confer decision making authority on agencies. *Mistretta,* 488 U.S. at 372. "[W]hen Congress confers decision-making authority upon agencies, Congress must 'lay down by legislative act an <u>intelligible principle</u> to which the person or body authorized to [act] is directed to perform.' " *Whitman,* 531 U.S. at 472 (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). The Supreme Court "has deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.' " *Mistretta,* 488 U.S. at 372-73 (quoting *Am. Power & Light Co. v. SEC,* 328 U.S. 90, 105 (1946)). (emphasis added).

Salazar, 2009 WL 3165591 at *4. Historically, courts have been highly deferential to Congress in finding the requisite "intelligible principle." Id. at 5. As examples, the Supreme Court has upheld directives to regulate in the "public interest," Nat'l Broadcasting Co. v. U.S., 319 U.S. 190, 225-26, 63 S. Ct. 997, 1013-14 (1943) (FCC -broadcast licensing); New York Central Securities Corp. v. U.S., 287 U.S. 12, 24-25, 53 S. Ct. 45, 48 (1932) (ICC-railroad acquisitions), fix "generally fair and equitable" prices, Yakus v.U.S., 321 U.S. 414, 426-27, 64 S. Ct. 660, 668-69 (1944) (wartime Office of Price Administration -commodity prices), and set standards "requisite to protect public health." Whitman, 531 U.S. at 473-76, 121 S. Ct. at 912-14 (EPA-air quality). Given the constitutionality of such broad directives, the enabling statute's more specific directive easily passes constitutional muster. It clearly delineates the general policy (to design allowances to ensure adequate means to provide for basic living expenses), the agency which is to apply it (the IRS through the Secretary of the Treasury), and the boundaries of the authority (the guidelines and Standards apply only to offers-in-compromise).

2) <u>Compliance with 26 USC § 7122(d)(2)(A)</u>:

Debtors argue the IRS violated the directive to publish multiple schedules "of national and local allowances" when in January, 2008, it established uniform National Standards irrespective of a taxpayer's income.[7] As such, they argue the Standards are not in effect.[8] California Wilderness Coalition v. U.S. Dept.

---

[7] Prior to January, 2008, the amount of each National Standard was tied to the taxpayer's gross monthly income, see e.g., Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers
(continued...)

MEMORANDUM OPINION-7

of Energy, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's clear mandate, the appropriate remedy is to vacate that action."). Again, Debtors cite no authority in support of their argument. Examining the enabling statute's plain language, Lamie, 540 U.S. at 534, 124 S. Ct. at 1030, the statute neither expressly nor impliedly prohibits the development of non-income-based amounts for categories of National Standards. As such, the Court cannot conclude the IRS failed to follow its statutory directive.

### 3) Compliance with the Administrative Procedures Act (APA):

Debtors argue the Standards are "rules" which the IRS failed to adopt in accordance with the Administrative Procedures Act (APA), 5 USC § 551 et. seq., thereby rendering them void and of no "effect." California Wilderness Coalition, 631 F.3d at 1095 ("where a regulation is promulgated in violation of the APA and the violation is not harmless, the remedy is to invalidate the regulation"); Bohner v. Daniels, 243 F. Supp. 2d 1171, 1176 (D. Or. 2003) (agency rule which violates APA is void and has no legal effect). The UST again argues Debtors have no standing to raise this argument because this isn't a tax case. For the same reasons as enunciated above, that argument is rejected. The UST also argues Debtors lack standing because at the least the published Standards at BAPCPA's effective date were "in effect" and thus the later more generous Standards caused them no harm or injury. See, 5 USC § 702; Sierra Club v. Morton, 405 U.S. 727,

---

[7](...continued)
(Cases Filed Between October 17, 2005 and February 12, 2006, Inclusive) (http://www.usdoj.gov/ust/eo/bapcpa/20051017/meanstesting.htm), the higher the gross income, the more generous the allowance. In January, 2008, the IRS abolished the correlation to income, so that all taxpayers were entitled to the same amount of any given National Standard. Means Testing, Census Bureau, IRS Data and Administrative Expenses Multipliers (Cases Filed Between January 1, 2008 and January 31, 2008, Inclusive) (http://www.usdoj.gov/ust/eo/bapcpa/20080101/meanstesting.htm)

[8]The UST has questioned Debtors' standing to raise this argument; it maintains Debtors suffered no injury by virtue of the switch to uniform National Standards in 2008. Although the pre-2008, National Standards were more generous than those published when Debtors filed their petition, even applying the more generous allowances would not decrease their disposable income to the point where the presumption of abuse did not arise. As such, the UST's standing argument appears meritorious. However, even assuming *arguendo* Debtors have standing, as explained below, the IRS has in fact complied with the enabling statute's directive.

MEMORANDUM OPINION-8

733, 92 S. Ct. 1361, 1365 (1972). The Court need not resolve this issue because even assuming Debtors' standing, for the reasons discussed below, the APA has not been violated.

As a threshold, the UST argues the APA simply does not apply because regulatory standards directly incorporated into statutes, as here, need not independently comply with the APA. U.S. v. Clayton, 506 F.3d 405 (5th Cir. 2007). In Clayton, a criminal statute which required the filing of a tax return incorporated by reference the Consumer Price Index (CPI) as published by the Department of Labor. The taxpayer argued the statute was invalid because the CPI had not been promulgated under the APA. The court rejected that argument holding Congress need not comply with the APA. It further held the CPI was an ascertainable numerical standard and there was "no requirement that such a standard incorporated into a statute be itself an enforceable rule of law." Id. at 409-10. The statute in Clayton however did not have "in effect" language; rather it merely incorporated the CPI published by the Department of Labor. Id. at 409, n.2. Because of this crucial distinction, the Court will examine whether development of the Standards complied with the APA. See, The Pantry, Inc. v. Stop-N-Go Foods, Inc., 777 F. Supp. at 731.

The APA generally governs agency rule-making. A "rule" is defined in 5 USC § 551(4) as:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

There are however different types of "rules," among them "interpretive" and "legislative."

> Interpretative rules are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers. By contrast, legislative rules . . . create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress.

L.A. Closeout, Inc. v. Department of Homeland Sec., 513 F.3d 940, 942 (9th Cir. 2008) (internal citations and quotations omitted). With limited exceptions, when an agency wants to promulgate a legislative rule, it must first be published as a proposed rule in the Federal Register, 5 USC § 553(b), and interested persons must be given an opportunity to submit "written data, views, or arguments with or without opportunity for

MEMORANDUM OPINION-9

oral presentation." 5 USC § 553(c). This process is commonly known as "notice and comment" rule-making. On the other hand, interpretive rules, along with general statements of policy,[9] or rules of agency organization, procedure, or practice are exempted from notice and comment requirements. 5 USC § 553(b)(3)(A). The UST concedes the Standards have not been subject to the notice and comment procedure. Debtors argue they should have been because both pre-BAPCPA, and more forcefully, post-BAPCPA, the Standards were/are legislative rules. Again, the Court agrees with the UST.

The Standards do not "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." L.A. Closeout, Inc., 513 F.3d at 942 (internal quotation omitted). The enabling statute itself prohibits the Standards from binding anyone, be it the IRS or taxpayer; rather, it identifies the Standards as adjuncts to discretionary guidelines, to be applied on a case-by-case basis. 26 USC § 7122(d)(2)(A) and (B); Rev. Proc. 2003-71,§ 6.04(2). Although web-based, *http://www.irs.gov/individuals/article/0,,id=96543,00.html*, the Standards are considered an exhibit to the Internal Revenue Manual (the Manual). I.R.M. Ex. 5.15.1-2 (Oct. 2, 2009).[10] It is well settled the Manual lacks the force of law. Fargo v. C.I.R., 447 F.3d 706, 713 (9th Cir. 2006) (holding the IRS did not abuse its discretion in rejecting an offer-in-compromise, and citing with approval, Marks v. Comm'r, 947 F.2d 983, 986, n. 1 (D.C. Cir. 1991) which held "the provisions of the manual are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law"). The holding in Herron v. Heckler, 576 F. Supp. 218 (N.D. Cal. 1983) cited by Debtors can be distinguished. There, the court held a provision in a Social Security Administration (SSA) claims manual setting limits on the amount of equity in property a claimant could own in order to qualify for supplemental security income benefits, were legislative rules and thus subject to notice and comment rule-making. Id. at 231. There however, the applicable

---

[9]"General statements of policy are statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Chrysler Corp. v. Brown, 441 U.S. 281, 302, n. 31, 99 S. Ct. 1705, 1718 (1979) (internal quotation omitted).

[10]The guidelines which explain and implement the Standards are part of the Manual's "Financial Analysis Handbook." See, I.R.M. §§ 5.15.1.8 (Oct. 2, 2009) (guidelines for National Standards) and 5.15.1.9 (Oct. 2, 2009) (guidelines for Local Standards).

MEMORANDUM OPINION-10

enabling statute directed the SSA to prescribe monetary limits, and the claims manual itself "create[d] precise, objective limitations" which "dictated a narrow, mechanical result." Id. at 231. Here, there are no like prescriptions, limitations or dictations in either the enabling statute or the Manual.

Finally, contrary to Debtors' argument, § 707(b)(2)(A)(ii)(I)'s passage did not convert the Standards into legislative rules. Rather, as discussed above, by incorporation, it converted them into statutes so long as they were effective. Simply put, Congress said "so long as the IRS develops the Standards the way we told it to in the enabling statute, they will be incorporated into the means test." In fact, that is what the IRS has done. There is no APA violation.[11]

E. Conclusion:

Because they have not been injured thereby, it is likely Debtors do not have standing to raise the validity of the Standards that were published when they filed their Chapter 7 case. Even assuming standing, § 707(b)(2)(A)(ii)(I) does not delegate authority to the IRS to develop the Standards. Rather, it merely incorporates those "in effect." As such, the statute is constitutional. Further, there was no defect in their development and publication, and thus the Standards published when Debtors filed were "in effect." Thus, any presumption of abuse based thereon is upheld. Because Debtors failed to rebut the presumption, the Court finds and concludes that affording them Chapter 7 relief would be an abuse of that chapter. Debtors will have 14 days to move to convert their case to another chapter of the Bankruptcy Code. If a motion is not timely filed, the case will be dismissed without further notice or hearing. An order consistent therewith will be entered.

// // // // //

// // // // //

// // // // //

---

[11] Alternatively, even assuming *arguendo* that post-BAPCPA the Standards became legislative rules and that as such the post-BAPCPA modifications were invalidly developed, Debtors would be left with the Standards as they existed in October, 2005 as the only ones "in effect." As discussed above, these were even less generous than those when they filed, and would, when applied in the means test, have equally raised the presumption which Debtors concede they have failed to rebut.

MEMORANDUM OPINION-11

1 | The above represents the Court's findings of fact and conclusions of law pursuant to FRBP 7052.
2 | They shall not be separately stated.

*signature*

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-12